UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CALEB MALLERY, JACKSON ROBAK,
NUZMEYA ABDRABBOH, AYAH
ABUELENAIN, RIDAA KHAN, SAEIDA
MARINI, JOHN PABLO ROJAS, and JENNA
SUKKAR,

     Plaintiffs,                            Case No. 25-cv-11894

v                                           Hon.
                                            Mag.

DAVID ZARRIEF, YOUSIF JIDDOU,
AARON HUNDT, JONATHAN PARNELL,
RODERICK BARKSDALE, COREY EISEL,
DANIEL WILLIAMS, DEAN DAVID STRAUSS,
ASSISTANT DEAN NIKOLINA DMITRUCHINA,
in their individual and official capacities,
WAYNE STATE UNIVERSITY; and WAYNE
STATE UNIVERSITY POLICE DEPARTMENT;

     Defendants.

---

Akeel & Valentine, PLC
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Daniel W. Cermak (P84460)
Hayden E. Pendergrass (P86888)
888 W. Big Beaver Rd., Ste. 350
Troy, MI  48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
daniel@akeelvalentine.com
hayden@akeelvalentine.com

Doraid B. Elder PC
Doraid B. Elder (P57728)
1360 Porter Street, Ste. 200

1

Dearborn, MI   48124
(313) 582-5800
doraidelderpc@gmail.com

Jeffrey L. Edison, Esquire (P25912)
3434 Russell Street, Suite 104
Detroit, MI 48207
313.964.0400
jelee@ix.netcom.com

The Khuja Law Firm, PLLC
Jamil K. Khuja (P71963)
1360 Porter St., Ste. 200
Dearborn, MI 48124
(313) 263-3353
jamil@khujalaw.com

Ayad Law PLLC
Nabih H. Ayad (P59518)
645 Griswold St Ste. 2202
Detroit, MI 48226
(313) 983-4600

Gerald Evelyn (P29182)
409 E Jefferson Ave., Ste. 500
Detroit, MI 48226
(313) 962-5300
geraldevelyn@yahoo.com

*Attorneys for Plaintiffs*

---

## COMPLAINT AND JURY DEMAND

**NOW COME** Plaintiffs, CALEB MALLERY, JACKSON ROBAK, NUZMEYA ABDRABBOH, AYAH ABUELENAIN, RIDAA KHAN, SAEIDA MARINI, JOHN PABLO ROJAS, and JENNA SUKKAR, by and through their undersigned counsel and for their Complaint against Defendants state as follows:

## **INTRODUCTION**

1.      This is a federal civil rights claim brought pursuant to 42 U.S.C. § 1983 for Defendants' violations of the Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendment of the U.S. Constitution through their violent raid, mass arrests, and continuing retaliation against a peaceful student protest.

2.      Defendants retaliated and discriminated against American students of various faith, race and ethnicity based on the content of their speech and viewpoints on issues of significant public interest to the university community – including students, faculty, and staff members at Wayne State University ("WSU") – and to the public at large, in violation of Plaintiffs' free speech, due process, and equal protection rights.

3.      Defendants acted against Plaintiffs who were standing up for causes that are greater than themselves, which included their advocacy for peace around the world, preservation of life, their opposition to the indiscriminate maiming, and/or killing of innocent and indigent Palestinian people of diverse faiths, and for their calls for WSU to divest from companies profiting off of the humanitarian disaster of Palestinians in Gaza.  But for their viewpoint on this issue, Plaintiffs would not have had their rights to freedom of speech, petition, and assembly, due process, and equal protection violated.

4.      Specifically, Defendants acted against these Plaintiffs and violated their rights through conduct including, but not limited to, the following:

3

a. initiating disciplinary proceedings against and issuing disciplinary sanctions to Plaintiffs for speech-related conduct while it has not subjected any other students or student groups engaged in similar conduct to disciplinary proceedings, reprimands, or other punishments;

b. undertaking a series of actions during disciplinary proceedings that violate the most basic notions of due process;

c. suppressing American students' right to speak on matters on campus that promote a more peaceful society;

d. arresting and initiating criminal charges without probable cause against each of the Plaintiffs, which included several false statements, that were all dropped; and

e. Retaliating further by initiating disciplinary proceedings after the criminal charges were dismissed.

5. In the early morning hours of May 30, 2024, Defendant, Wayne State University ("WSU"), and its police department ("WSUPD"), led by Defendant David Zarrieff – without probable cause and with open hostility toward American students' viewpoint – stormed tents on Gullen Mall, brutalized sleeping students, parents, and alumni, confiscated property, and prosecuted and humiliated them on sham trespass charges later rejected by county prosecutors.

6. Immediately after the charges were rightfully dismissed, Defendants, led by David Zarrieff – retaliated further by recommending and filing student disciplinary charges against Plaintiffs to harm their student academic status, and career.

7.    This action seeks redress and a decisive judicial declaration that the Constitution does not yield to administrative convenience or political pressure.

## JURISDICTION AND VENUE

8.    This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 *et seq*., and the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, as well as under state law.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367.

9.    Venue is proper in this Court as Defendants conduct business within the Eastern District of Michigan, are subject to personal jurisdiction within the Eastern District of Michigan, and a substantial part of the events giving rise to the claims alleged occurred in the Eastern District of Michigan.  *See* 28 U.S.C. § 1391(b), (e).

10.    This Court is authorized to award the requested declaratory and injunctive relief under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201-2022, and this Court's equitable powers.

## PARTIES

### Plaintiffs

11.    Plaintiffs are U.S. Citizens who, at all relevant times, were WSU students, graduates, or the parent of a student.

12.    Plaintiff, CALEB MALLERY, was enrolled in the 2024 Spring Semester at Wayne State University and maintains his enrollment currently.

5

13.     Plaintiff, JACKSON ROBAK, was enrolled in the 2024 Spring Semester at Wayne State University and maintains his enrollment currently.

14.     Plaintiff, NUZMEYA ABDRABBOH, was enrolled in the 2024 Spring Semester at Wayne State University and maintains her enrollment currently.

15.     Plaintiff, AYAH ABUELENAIN, is a 2022 graduate of Wayne State University.

16.     Plaintiff, RIDAA KHAN, was enrolled in the 2024 Spring Semester at Wayne State University and has since graduated.

17.     Plaintiff, JENNA SUKKAR, was enrolled in the 2024 Spring Semester at Wayne State University and maintains her enrollment currently.

18.     Plaintiff, JOHN PABLO ROJAS, was enrolled in the 2024 Spring Semester at Wayne State University and has since graduated.

19.     Plaintiff, SAEIDA MARINI, is the parent of Plaintiff Ayah.

**WSU Defendants**

20.     Defendant, WSU, is a public university and governmental entity receiving federal funding and acting under color of state law.

21.     Defendant, WSUPD, is an agency of WSU and, at all times, acted under color of state law.

22.     Defendant, DAVID STRAUSS, Ph.D., is the Dean of Students for WSU, responsible for student discipline, and is sued in his individual and official capacities.

23.     Defendant, NIKOLINA DMITRUCHINA, is the Assistant Dean of Students and Student Conduct Officer, responsible for student discipline, and is sued in her individual and official capacities.

24.     Defendants WSU, WSUPD, STRAUSS, and DMITRUCHINA are hereinafter referred to as the "WSU Defendants."

**Individual WSUPD Defendants**

25.     Defendant, DAVID ZARRIEF, the WSUPD Captain, commanded the response to the peaceful sit-in protest, sought charges against Plaintiffs, and is being sued in his individual and official capacities.

26.     Defendant, YOUSIF JIDDOU, WSUPD Officer, responded to the peaceful sit-in protest, arrested and charged Plaintiffs, and is being sued in his individual capacity.

27.     Defendant, AARON HUNDT, WSUPD Officer, responded to the peaceful sit-in protest, arrested and charged Plaintiffs, and is being sued in his individual capacity.

28.     Defendant, JONATHAN PARNELL, WSUPD Officer, responded to the peaceful sit-in protest, arrested and charged Plaintiffs, and is being sued in his individual capacity.

29.     Defendant, RODERICK BARKSDALE, WSUPD Officer, responded to the peaceful sit-in protest, arrested and charged Plaintiffs, and is being sued in his individual capacity.

30.     Defendant, COREY EISEL, WSUPD Officer, responded to the peaceful sit-in protest, arrested and charged Plaintiffs, and is being sued in his individual capacity.

31.     Defendant, DANIEL WILLIAMS, WSUPD Officer, responded to the peaceful sit-in protest, arrested and charged Plaintiffs, and is being sued in his individual capacity.

32.     Defendants     ZARRIEFF,     JIDDOU,     HUNDT,     PARNELL, BARKSDALE, EISEL, and WILLIAMS are hereinafter referred to as the "Individual WSUPD Defendants."

<u>**BACKGROUND AND FACTUAL ALLEGATIONS**</u>

**A.     The Quintessential Right – Free Speech at Universities.**

33.     Throughout American history, college students – the future leaders of our country – have served as a moral compass for America and standing up for causes greater than themselves.

34.     Often times these student-led movements result in the awakening of America's conscious to end up follow the founding fathers' vison including Thomas Jefferson's Empire of Liberty, believing that America had a role in promoting freedom globally, where he expressed hope that "this ball of liberty will roll round the world."

35.     There have been student protests in the United States for nearly as long as there have been students, though student movements made critical gains in numbers and power following World War II.

36.     In the wake of McCarthyism's anti-Communist sentiments during the 1950s, public universities in California had enacted numerous regulations limiting students' political activities.  The University of California-Berkeley banned student groups taking part in any on- or off-campus political activities from campus. Starting in 1964, students protested the university's limits on political activities and free speech during the civil rights movement and Vietnam-war era.  Small sit-ins and demonstrations escalated into a series of large-scale rallies and protests demanding full constitutional rights on campus.  Nearly 800 students were arrested by local police as a result.  The students' protest ultimately worked in their favor.  The university eventually overturned policies that would restrict the content of speech or advocacy.

37.     The most prolific university protest of the Vietnam War happened at Kent State University in Ohio in May 1970.  Students started protesting the Vietnam War and the U.S. invasion of Cambodia on their campus on May 2.  Two days later, the National Guard opened fire into a sea of antiwar protesters and passersby.  The soldiers killed four students – Allison Krause, Jeffrey Miller, Sandra Scheuer, and William Knox Schroeder – and injured several others.   The event triggered a

nationwide student strike that forced hundreds of colleges and universities to close. A Commission concluded that the shooting was unjustified.

38.     Days after the shootings at Kent State, police opened gunfire at a college dormitory Jackson State College in Mississippi, a school with a predominantly Black student population.  Black students there were protesting racial injustice, including how they were treated by white drivers speeding on campus. Police received a call that Black young people were throwing rocks at white drivers near the campus.  Police arrived at the scene and shot hundreds of bullets into Alexander Hall, according to an FBI report.  Police killed two students – Phillip Lafayette Gibbs and James Earl Green – and injured 12 others.  The college also canceled its graduation due to the killings and unrest.  At a 2021 commencement ceremony, the university honored 74 of the students who were unable to walk the stage in 1970.

39.     The killings at Jackson State College and Kent State University national sparked outrage.  College students across the nation protested on their campuses. Angus Johnston, an adjunct assistant professor at Hostos Community College of the City University of New York and a historian of student activism, said after both events: "*There was a period of about 30 years or so where it tended to be fairly unlikely that campuses would respond with mass arrests even in the case of admin building occupations*."

40.     Another form of popular college campus protest occurred in the 1980's. Students across the country wanted their colleges to cut ties with groups that supported from the South African apartheid.  Under apartheid, race restricted every aspect of life for South Africans who were Black, Indian, and "colored" – a multiracial classification created by the government.  There were strict limits on where they could live, attend school, work and travel.  Columbia University was at the center of the movement.  Students led by the Coalition for a Free South Africa at Columbia University blockaded Hamilton Hall, the university's administrative building, leading to the first successful divestiture campaign at the university. Columbia University was one of the first colleges to divest from doing business with South Africa and 155 universities followed suit.  U.S. Congress also passed the Comprehensive Anti-Apartheid Act in 1986, which aimed to prevent new trade and investment between the nation and South Africa.

**B.     The May 2024 Peaceful Protest.**

41.     On May 23, 2024, a group of students and allies erected a sit-in protest – encampment – on the public lawn outside State Hall at Wayne State University ("WSU") peacefully protesting for the school to divest from companies profiting off of the humanitarian crises of the Palestinian people living in Gaza.

42.     Plaintiffs, along with other student demonstrators, represented a diverse coalition of individuals from also multiple faith traditions—including Judaism, Christianity, and Islam—and were affiliated with various recognized student and advocacy organizations, including Jewish organizations – all advocating for

11

promotion of human rights. This broad coalition unified to peacefully protest in support of international human rights and against ongoing humanitarian crises, engaging in constitutionally protected expression and assembly on campus.

43.     The action was one of many springing up on campuses nationwide as students reacted to the humanitarian crisis in Gaza, where more than 36,000 Palestinians – mostly women, children, and the elderly – had been killed within just the prior 8 months – where the number now has exceeded 50,000 by some estimates.

44.     Their sit-in protest featured roughly 50 tents, a community eating area, and books on Gullen Mall near the undergraduate library.

45.     The protest was peaceful and community-driven, mainly by American students.

46.     The sit-in protest complied with campus safety and fire codes and a fire marshal conducted multiple walkthroughs of the site to confirm compliance with fire safety codes.

47.     Even when confronted by counter-protesters using loudspeakers, students responded with calm, peace, and resolve.

48.     Despite early reassurances from WSU President, Kimberly Andrews Espy, that WSU would engage in a dialogue and uphold the values of free expression, WSU Defendants changed course.

49.     To escalate the situation and prepare for police intervention, WSU shifted to remote operations, citing an unspecified "public safety issue."

50.     WSU released false statements to the press to pretextually justify police intervention, including that student-protestors denied the administration's request to meet with them.

51.     At 5:30 a.m. on May 30, the Individual WSUPD Defendants, under the direction of Defendant Zarrieff, descended on the sleeping students.

52.     Students were allegedly given ten minutes to disperse but the Individual WSUPD Defendants entered around the eighth minute – before the warning time expired – and began dismantling tents.

53.     Many students and sit-in protest attendees never heard of any alleged order by Individual WSUPD Defendants or any officer to disperse.

54.     Despite the lack of warning, students and allies, including Plaintiffs, complied with the Individual WSUPD Defendants demands and re-gathered at a public sidewalk just outside of campus along Warren Avenue.

55.     As Plaintiffs and other students and allies were retreating pursuant to WSUPD orders, several WSUPD officers wielding batons lunged at them, threw them to the ground, pounced on them, and threatened to use pepper spray.

56.     WSUPD also brought in a bulldozer and a dumpster, discarding personal belongings and supplies, including tents, signs, tables, and boxes full of water bottles and food.

57.     During the raid, at least a dozen individuals were arrested.

58.     Most of the arrests were for allegedly trespassing.

59.     WSUPD in tactical, or riot, gear formed lines at various points on

13

campus.

60.     The Individual WSUPD Defendants surrounded, denied safe exit, and physically restrained students and allies, including Plaintiffs.

61.     The Individual WSUPD Defendants forcibly removed the hijab of then-19-year-old Plaintiff, Nuzmeya Abdrabboh, a WSU student protester.

62.     Protesters pleaded with the Individual WSUPD Defendants to fix her scarf.

63.     The Individual WSUPD Defendants refused, forcing her to remain without her head scarf long enough for videos to be taken and spread around the world.

64.     Instead of meaningfully addressing the hijab removal or the broader claims of excessive force, WSU President Espy defended the raid by again citing unspecified health and safety concerns and stating that the protest presented "legal, operational, and safety" risks to the community, without any explanation for how.

**Nuzmeya Abdrabboh**

65.     On the morning of May 30, 2024 – the day the Individual WSUPD Defendants violently broke down the students' sit-in protest or encampment, Nuzmeya was sleeping in a tent.

66.     Nuzmeya was abruptly awakened by a friend telling her urgently that police had arrived in riot gear and were approaching their location.

67.     Upon awakening, she immediately noticed the officers in riot gear but did not hear any announcements or instructions from them at that time.

68.    As the police advanced, Nuzmeya quickly gathered what belongings she could but had to leave several items behind due to the urgency of the situation.

69.    She and her friends exited the sit-in protest area, moving towards Cass Avenue near Old Main, where they congregated on the public city sidewalk. However, after some time, the police began to move toward them again.

70.    In response, Nuzmeya and her group started walking backward with their hands raised, explicitly stating aloud that they were leaving.

71.    Nuzmeya and her friends walked backwards with their faces facing the police so that officers could see them saying that they were complying and to avoid leaving officers with any doubts about their intentions and actions.

72.    Despite this compliance, police officers suddenly intensified their actions.

73.    Nuzmeya, while moving backwards, had her scarf forcefully grabbed by an officer, causing her to fall head-first to the ground.

74.    Her scarf was ripped off, and she was shoved onto the pavement.

75.    She repeatedly pleaded with the officers to return her scarf, emphasizing its personal and religious significance.

76.    Throughout this interaction, police mocked her and others, goading that they "should have thought of this" earlier and should "think about their futures."

77.    Following this incident, Nuzmeya was detained and placed in a police vehicle.

78.    Nuzmeya offered no resistance and complied fully.

79.     She remained in the police car for several hours, during which time an officer threatened that she might face felony charges, leaving her anxious and uncertain.

80.     However, throughout WSU's shutdown of the encampment on May 30, Nuzmeya complied with WSUPD's primary instruction – to vacate the encampment or sit-in protest area.

81.     Despite her visible cooperation and verbal assurances, she and others were arrested, and charges were brought against her.

**John Pablo Rojas**

82.     On the morning of May 30, 2024, John Pablo was abruptly awakened in his tent by another student protester who had opened the flap, urgently informing him that the police had arrived.

83.     John Pablo did not directly hear any alleged police announcements himself at that time.

84.     The large number of tents meant some students received little to no advance notice of any police orders.

85.     John Pablo began to help fellow students leave safely.

86.     As police advanced, John Pablo began walking backwards out of the encampment alongside another student, continuously observing the unfolding events to verify that everyone was leaving safely.

87.    Without any explicit warning or explanation, the Individual WSUPD Defendants detained John Pablo.

88.    John Pablo offered no resistance and complied fully.

89.    At no point during his detention did the Individual WSUPD Defendants articulate the specific reason for his arrest.

90.    Following his arrest, the Individual WSUPD Defendants placed John Pablo in the back of a police car, where he remained detained for some time, and brought charges against him.

**Jenna Sukkar**

91.    On the morning of May 30, 2024, Jenna was not initially present on campus when the removal of the student protest encampment began.

92.    Instead, she was alerted through Instagram live streams, where she saw her friends being arrested, prompting her immediate concern and decision to head to campus.

93.    Upon arrival, Jenna quickly moved towards the area where students were gathered.

94.    Jenna's primary intention was to check on her friends, particularly Plaintiff Jackson, whom she learned had been forcefully thrown to the ground by police.

95.    When Jenna reached the area, she observed the ongoing interactions between protestors and police and began recording on her phone.

96.   The Individual WSUPD Defendants never said anything to Jenna while she was standing and recording the scene.

97.   Without any prior warning or instruction from the Individual WSUPD Defendants, Jenna was suddenly kicked from behind in the legs by an officer.

98.   Immediately after being kicked from behind, three police officers aggressively threw her onto the ground.

99.   The Individual WSUPD Defendants forcefully detained Jenna despite the absence of any illegal activity, misconduct, provocation, or resistance.

100.   Throughout this encounter, the WSUPD Defendants did not issue any verbal commands or explanations to her regarding dispersing the assembly or providing reasons for her detention.

101.   Jenna was alone in her immediate space when she was detained, though a crowd stood nearby, clearly stepping back and moving away from the advancing WSUPD.

102.   The Individual WSUPD Defendants placed Jenna into a police vehicle without any explanation or stated justification.

**Caleb Mallery**

103.   On the morning of May 30, 2024, Caleb was sleeping in his tent at the student protest encampment on campus.

104.   Caleb was abruptly awakened by the presence of four or five police officers surrounding his tent, loudly threatening to tear it down.

105.   The Individual WSUPD Defendants immediately asked if anyone was inside and Caleb responded that he was present, at which point the officers ordered him to vacate immediately.

106.   Caleb complied and attempted to immediately vacate.

107.   Despite his immediate compliance, he was quickly and forcefully detained.

108.   The Individual WSUPD Defendants pulled Caleb out of his tent before he could put his shoes on.

109.   Without providing any reason for their actions, one officer shouted an order to arrest Caleb.

110.   Caleb was then placed in handcuffs, turned around, and dragged by his arms, causing his heels to scrape across the field as he was forcibly taken to a WSUPD vehicle.

111.   Caleb never resisted against the officers throughout his detainment and arrest.

112.   Caleb was cooperative, yet the Individual WSUPD Defendants employed significant force in moving him to the police vehicle.

113.   Upon reaching the police car, Caleb was placed inside alongside another detained student.

114.   Shortly afterward, both were transferred from the police car to a police van.

115.   Caleb never received clear communication or guidance from the WSUPD Defendants about what was happening or why they were being detained.

116.   Eventually, Caleb and other detained students were transported to the police station.

117.   Initially, Caleb was informed by an officer that he would receive a civil infraction ticket for trespassing, and the matter would be handled administratively.

118.   However, he later discovered the issued ticket was marked as a misdemeanor, a discrepancy from what he was initially told by the Individual WSUPD Defendants.

**Jackson Robak**

119.   On the morning of May 30, 2024, Jackson was sleeping deeply.

120.   Jackson was awakened by another student hitting his tent and alerting him that the police had arrived at the encampment.

121.   Upon waking, Jackson observed a significant presence of police officers in full riot gear arranged in rows and columns.

122.   Jackson never heard police instructions or announcements directed to the students after he woke up.

123.   The Individual WSUPD Defendants simply walked forward into protestors without giving any orders.

124.    Seeing the advancing officers with their batons and pushing students back despite the lack of clear directives, Jackson began walking towards the designated exit of the encampment near Gullen, accompanied by another student.

125.    As they proceeded, both Jackson and the other student began recording the unfolding scene out of concern over potential police brutality.

126.    While walking backwards, only about three feet away from the exit, Jackson witnessed a WSUPD officer suddenly lunge towards him and another student.

127.    The WSUPD officer who lunged at Jackson had been destroying tents when he noticed a student with their cellphone recording, and lunged at that student.

128.    After witnessing this aggressive incident, Jackson quickly left campus, running approximately two blocks away out of fear that the WSUPD officer would target him next.

129.    However, driven by concern for the safety of friends who were livestreaming the event, he soon returned.

130.    It was at this point, near Anthony Wayne Drive, that Jackson was detained by the Individual WSUPD Defendants in a violent manner.

131.    Four police officers forcibly held Jackson down with their hands on his neck, causing him to black out momentarily.

132.    Jackson regained consciousness as the Individual WSUPD Defendants threatened to use their taser on him.

133.    Jackson had his hands up and repeatedly said that he is not resisting and does not want to be tased.

134.    Jackson offered no resistance and complied fully.

135.    After his brutal arrest, Jackson spent approximately an hour and a half detained in a police vehicle, then in a paddy wagon, without being informed of the reasons for his arrest.

136.    The Individual WSUPD Defendants injured Jackson's nose during the arrest, causing him to visibly bleed, and he recalls witnessing the intense fear of those witnessing the brutal actions against him, heightening the emotional and physical trauma of the event.

**Ayah Abuelenain**

137.    On the morning of May 30, 2024, Ayah was not initially present at the encampment or sit-in protest area during the early morning police raid because she had previously left to return home and attend to work obligations.

138.    Around 6:00 AM, she received news of the police raid and quickly returned to campus to support her fellow protesters.

139.    Upon her arrival, Ayah joined other students protesting in an alley located between the engineering buildings.

140.    As tensions escalated, Ayah alongside Plaintiff Nuzmeya began carefully stepping backward along with the crowd as the Individual WSUPD Defendants advanced.

141.   Despite their clear retreat and compliance, an officer identified Ayah and Nuzmeya specifically, shouting to fellow officers, "Grab those two!"

142.   Ayah was immediately seized by her jacket by an officer.

143.   Ayah's jacket slipped off, but the officer then grabbed her bag instead, pulling it tightly and causing Ayah to experience choking.

144.   Despite the danger and her clear distress, the officers forcibly arrested Ayah.

145.   Alongside Ayah, her cousin Nuzmeya and Ayah's mother, Saeida Marini, were also arrested.

146.   Ayah was detained in police custody for approximately nine hours before finally being released.

**Saeida Marini**

147.   On the morning of May 30, 2024, Saeida arrived at the encampment or sit-in protest area with her daughter, Plaintiff Ayah.

148.   Saeida was closely monitoring the escalating tensions and observing police aggressively following the students.

149.   When officers grabbed Saeida's daughter, Ayah's, crossbody bag, causing Ayah to choke, Saeida exclaimed "that's my daughter" and tried to protect her daughter from harm.

150.   Amidst the chaos, officers swiftly moved in and arrested Saeida, Ayah, and Saeida's niece, Nuzmeya.

151.   The police transported Saeida and her family to a detention center, where she observed officers issuing citations to individuals in nearby vehicles and subsequently releasing them.

152.   However, Saeida, her daughter, and her niece remained detained without immediate release.  Their release occurred only after an attorney became involved, securing their eventual freedom.

**Ridaa Khan**

153.   On the morning of May 30, 2024, Ridaa was suddenly awakened by someone alerting her that police were lining up outside.

154.   The situation quickly intensified, leaving very little time for reaction or preparation.

155.   Officers charged at Ridaa and others.

156.   Officers swiftly approached and used ropes to apprehend Ridaa and another student forcibly.

157.   Ridaa offered no resistance and complied fully.

158.   The officers guided them towards the education building, where a large truck awaited.

159.   Once there, the officers took their information and placed them in the truck.

160.   Within ten minutes, additional detained individuals filled the truck.

161.   Subsequently, they were transported to a police station.

162.   After spending some time in custody, Ridaa, along with most others detained, was eventually released with a ticket.

### C.   Criminal Charges

163.   On May 30, 2024, each of the Plaintiffs were charged with Trespassing by various WSUPD officers, including Yousif Jiddou, Aaron Hundt, Jonathan Parnell, Roderick Barksdale, Corey Eisel, and Daniel Williams, who executed the arrests of Plaintiffs.  **Exh. A** – Registers of Action.

164.   Each of the Plaintiffs entered not guilty pleas.  **Exh. A** – Registers of Action.

165.   The WSUPD Defendants made various unsubstantiated claims against Plaintiffs and protestors to justify their actions, but Wayne County Prosecutor, Kym Worthy, found these claims false or without basis.

166.   Among the charges, one officer arrested Plaintiff Jenna based on the allegation that she "hit" his shield.  According to WCP Worthy, the footage shows that was not true.

167.   The WSUPD Defendants claimed Plaintiff Jenna cursed at officers while she filmed them with her phone and then hit an officer's shield while gesturing with her arm.  The WSUPD Defendants pulled her behind the police line and arrested for assault, but body camera footage shows that she never hit or touched the officer's shield.

168.    Plaintiff Jackson tried to help a woman who was pushed to the ground by a WSUPD officer and "stiffened his arms refusing to be handcuffed," so he was allegedly arrested for resisting and obstructing an officer.  WCP Worthy found that "*the facts show that the 24-year-old man [Plaintiff Jackson] assisted a woman who was being arrested that did not commit a crime.  When he was placed under arrest for helping her, his only action was to stiffen his arms.*"  WCP Worthy said there was not enough evidence to charge Jackson.

*169*.    WCP Worthy also found that officers targeted a female student protestor – Plaintiff Nuzmeya – simply because she had a bullhorn.  After violently taking down Plaintiff Ayah who was protesting peacefully with her mother and Plaintiff Nuzmeya, WSUPD officers turned their attention to Plaintiff Nuzmeya.  According to WCP Worthy, a WSUPD officer "*focused*" on the protestor because she had a bullhorn, grabbed her from behind, and took her to the ground with the help of other officers.  The student did not attempt to flee and was arrested for trespassing.  As WCP Worthy said, the "*protestor was singled out because she had a bullhorn, exercising her First Amendment right to free speech, not because of an alleged trespass.*"

170.    According to WCP Worthy, Plaintiff Saeida yelled "*that's my daughter*" when the officer grabbed Plaintiff Ayah and, in turn, grabbed onto her, and was also issued a ticket for trespassing.

171.    Also, according to WCP Worthy, Plaintiff Nuzmeya was holding onto the 53-year-old mother (Plaintiff Saeida) as the police attempted to arrest her and was also detained for trespassing.  Plaintiff Nuzmeya did not attempt to flee, and officers ripped her hijab off as they took her to the ground from behind.

172.    According to WCP Worthy, the incident took place near where protestors were told they were allowed to demonstrate.

173.    While it was on WSU property, WCP Worthy said it was in the middle of a publicly accessible sidewalk.

174.    WCP Worthy said there was not enough evidence to charge the three women, Plaintiffs Nuzmeya, Saeida, and Ayah, with trespassing.

175.    As of January 9, 2025, WCP Worthy dropped all charges against Plaintiffs.

176.    All of the tickets or charges against Plaintiffs were dismissed.

177.    WCP Worthy found that Plaintiffs were peaceful and non-violent.

178.    As WCP Worthy said, "*The right to peacefully protest and demonstrate is deeply woven into the American fabric.  The [Wayne County Prosecutors Office] has thoroughly studied and examined these cases and we have determined that they do not rise of the level of criminal behavior.*"

**D.    Student Misconduct Allegations**

179.    Still seeking retaliation after WCP Worthy dismissed all tickets or charges, and without regard to the constitutional rights of the student Plaintiffs,

Defendant Zarrieff implored WSU to bring student-misconduct charges against American students, Plaintiffs Mallery, Robak, Abdrabboh, Khan, Rojas, and Sukkar to threaten their career.

180.   On or around January 10, 2025, WSU, through Defendant Dmitruchina, charged Plaintiffs Mallery, Robak, Abdrabboh, Khan, Rojas, and Sukkar with violating Section 4.15 of the WSU Student Code of Conduct.

181.   Section 4.15 states: "*4.15 Failure to comply with the direction of any authorized institutional representative, acting in performance of his/her duties*."

182.   WSU alleged that "*on May 30, 2024, you allegedly failed to comply with the lawful orders given by the Wayne State University Police Department to exit the Wayne State University campus…*"

183.   On January 16, 2025, Defendant Dmitruchina wrote to Plaintiff Khan that the charge against her had been "*withdrawn*" because she had already graduated and was not enrolled at WSU.   **Exh. B** – WSU Withdrawal.

184.   The WSU Defendants – at the insistence of Defendant, Zaarieff – pressed forward with their charges against Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

185.   On or around January 28, 2025, Defendant Dmitruchina allegedly conducted individual "fact-finding" sessions with Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

186.   On or around February 11, 2025, Defendant Dmitruchina issued letters to Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

187.   Relying on the "police records", and ignoring Prosecutor's Worthy's findings, Defendant Dmitruchina alleged that Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar "*refused to leave the area following notification.*"

188.   Defendant Dmitruchina then claimed that "*version of events*" of Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar "*lack[ed] credibility.*"

189.   The WSU Defendants sanctioned Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar, including issuing a "disciplinary reprimand" which "serves as notification that you have been found responsible for violation of the Student Code of Conduct and a warning that further violation(s) may necessitate more serious disciplinary action."

190.   The WSU Defendants also said that "any further Student Code of Conduction violations…will result in disciplinary sanctions."

191.   Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar each appealed WSU's decision.

192.   On or around March 6 and March 11, 2025, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar each individually met with Defendant WSU's Dean

of Students, Defendant David J. Strauss, to appeal the WSU decision to issue a "disciplinary reprimand" to each of them.

193. At the individual meetings with Defendant Strauss, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar answered questions Defendant Strauss had prepared in advance based on alleged evidence he collected.

194. Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar were not advised whether they could bring evidence to support their statements or have an opportunity to challenge the evidence Defendant Strauss allegedly relied on.

195. On or around March 19, 2025, Defendant Strauss issued individual letters to Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar, finding them each responsible for allegedly violating Section 4.15 of the WSU Student Code of Conduct.

196. Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar were each sanctioned by Defendant Strauss.

197. Defendant Strauss claimed Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar "committed an act of misconduct" and warned "that another offense may result in the imposition of a more serious sanction."

198. Defendant Strauss's "sanction is final and effective immediately."

199. Defendants' excuse – public safety – amounts to an undifferentiated fear or apprehension of disturbance by the Plaintiffs' peaceful sit-in protest and acted on that undifferentiated fear or apprehension of disturbance.

200.  Defendants' misconduct was not reasonable because, "*in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.*"  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

201.  Indeed, Defendants' misconduct listed above is aggravated by the bedrock freedoms of the United States, including that Plaintiffs' "*mere dissemination of ideas – no matter how offensive to good taste – on a state university campus may not be shut off in the name alone of 'conventions of decency.'*"  *Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667, 670 (1973).

202.  Defendants' misconduct also violated this Nation's longstanding principle that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  Indeed, the "college classroom with its surrounding environs is peculiarly the 'marketplace of ideas'…"  *Healy v. James*, 408 U.S. 169, 180 (1972) (citations omitted).

## CLAIMS FOR RELIEF

### COUNT ONE

**42 U.S.C. § 1983**
**First Amendment Violations: Deprivation of Rights to Free Speech, Petition, & Assembly; Unlawful Restraints on Speech**
**By Plaintiffs Mallery, Robak, Abdrabboh, Rojas, & Sukkar**
**Against the WSU Defendants**

203.  Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

204.   Acting under color of law and pursuant to the customs, policies, and/or practices of WSU, the WSU Defendants, acting in their respective individual and/or official capacities, engaged in conduct and adopted policies that violate the First Amendment rights of Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

205.   The Freedom of Speech Clause of the First Amendment reads: "Congress shall make no law … abridging the freedom of speech."

206.   Under the Free Speech Clause, state actors cannot retaliate or discriminate against persons because of the content of their speech, or the views expressed.[1]

207.   Moreover, under the Free Speech Clause, state actors may not require a permit before persons can express certain viewpoints in public forums, may not require permits or otherwise provide a prior restraint to restrict speech because of opposition to the viewpoints expressed, and cannot otherwise require permits before persons may speak in such forums.

208.   The Petition Clause of the First Amendment reads: "Congress shall make no law … abridging the freedom … to petition the Government for a redress of grievances."

---

[1] None of the exceptions to this prohibition are present in this case.

209.   Under the Petition Clause, state actors cannot retaliate or discriminate against persons because they sought to petition the government on issues of public concern.

210.   The Assembly Clause of the First Amendment reads: "Congress shall make no law … abridging the … right to of the people to peacefully assemble."

211.   Under the Assembly Clause, state actors may not impermissibly restrict the ability of people to gather, assemble and advocate for their beliefs.

212.   The First Amendment is incorporated within the Fourteenth Amendment and thereby made applicable to state governments and their subdivisions.

213.   The Supreme Court has also stated that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506 (1969).

214.   The WSU Defendants' policies and practices violate constitutional protections under the First Amendment by retaliating and discriminating against Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar because of the content of their speech, the exercise of their right to petition and assembly, and university officials' opposition to views Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar expressed.

215.   The WSU Defendants adopted a pattern and practice of hindering, obstructing, harassing, and suppressing the ability of Plaintiffs Mallery, Robak,

Abdrabboh, Rojas, and Sukkar to engage in peaceful protest by wrongfully having them arrested and subsequently initiating disciplinary proceedings against then-current WSU students, Plaintiffs – Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

216.   Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar here engaged in constitutionally protected free speech.

217.   Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar also sought to petition the WSU Defendants.

218.   The WSU Defendants initiated student disciplinary proceedings against then-current WSU students, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar solely for their expressions against genocide or indiscriminate killing of innocent Palestinian people, or pro-humanitarian, speech and the exercise of their rights to petition and assembly.

219.   But for their expressions of particular pro-humanitarian viewpoints and exercise of their rights to petition and assembly, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar would not have faced student discipline.

220.   The WSU Defendants' use of student disciplinary sanctions is disproportionately targeted at these particular protestors, whose speech and exercise of their rights to petition and assembly the WSU Defendants dislike.  Despite a long history of protest activity regarding countless issues at WSU, which has sometimes included acts of civil disobedience, it appears that no other group of protestors have

been subjected to similar student disciplinary proceedings for the same or similar alleged activity.

221. The WSU Defendants' policies and practices to sanction Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar with formal reprimands punished them solely for their expressions against the indiscriminate killing of innocent indigent Palestinian people, or pro-Humanitarian, speech, as well as their exercise of their rights to petition and assembly, and diminished their standing as students by effectively put a black mark on their student records.

222. The formal reprimand also serves as a prior restraint as it signals to a reasonable person that if they undertake similar activity – in this case expressing a viewpoint against the indiscriminate killing of innocent Palestinian people, or pro-Humanitarian, speech and participating in protest activities – they will face greater disciplinary consequences.

223. The WSU Defendants violated Free Speech rights of Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar in that (a) their actions to subject Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar to disciplinary proceedings and punishments are viewpoint- and content-based because WSU has allowed other students to demonstrate without such adverse consequences; (b) they proscribe speech in public forums – through, among other acts, authorizing and permitting wrongful arrests - in a manner that is not narrowly tailored and is without substantial government justification; and (c) their actions impermissibly restrain speech.

224.   As a direct and proximate result of the enactment and enforcement of the WSU Defendants' policies and practices, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar suffered and/or will continue to suffer a loss of their constitutionally protected rights to engage in free speech.

225.   The WSU Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar are entitled to declaratory relief and appropriate injunctive relief against the WSU Defendants together with costs and attorney fees. Additionally, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants Strauss and Dmitruchina, individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

## COUNT TWO

**42 U.S.C. § 1983**
**Fourteenth Amendment Violations: Deprivation of Rights to Liberty Interest in Free Speech, Petition, & Assembly Without Due Process**
**By Plaintiffs Mallery, Robak, Abdrabboh, Rojas, & Sukkar**
**Against the WSU Defendants**

226.   Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

227.   Acting under color of law and pursuant to the customs, policies and practices of WSU, the WSU Defendants, acting in their respective individual and/or official capacities, engaged in conduct and adopted policies that violated liberty interest in free speech rights of Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

228.   Plaintiffs engaged in protected free speech in advocating for peace and opposing the indiscriminate killing of innocent Palestinian people, including women, children, and the elderly.

229.   WSU Defendants took adverse actions against Plaintiffs because of their protected speech.

230.   But for their expressions of their rights of free speech, petition, and assembly, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar would not have faced disciplinary actions by Defendants.

231.   There was no legitimate government justification for the arrests and/or disciplinary actions by Defendants.

232.   As a direct and proximate result of the enactment and execution of the WSU Defendants' policies and practices, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar suffered and/or will continue to suffer a loss of their constitutionally protected due process rights.

233. The WSU Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar are entitled to declaratory relief and appropriate injunctive relief against the WSU Defendants together with costs and attorney fees. Additionally, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, emotional distress, and punitive damages against Defendants Strauss and Dmitruchina, individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

## COUNT THREE

### 42 U.S.C. § 1983
**Fourteenth Amendment Violations: Deprivation of Equal Protection Rights
By Plaintiffs Mallery, Robak, Abdrabboh, Rojas, & Sukkar
Against the WSU Defendants**

234. Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

235. Acting under color of law and pursuant to the customs, policies, and/or practices of WSU, the WSU Defendants, acting in their respective individual and/or

official capacities, engaged in conduct and adopted policies that violate the equal protection rights of Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

236. The Equal Protection Clause states, in pertinent part: "No state shall … deny to any person within its jurisdiction the equal protection of the laws."

237. The Equal Protection Clause requires state actors to treat similarly situated persons equally.

238. The WSU Defendants' conduct, as described above, violated the Equal Protection Clause by denying equal application of the rules and policies of WSU in the initiation and conduct of disciplinary proceedings to Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

239. The WSU Defendants further violated the Equal Protection Clause by intentionally targeting Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar for disciplinary proceedings while knowingly allowing other students who espouse opposing viewpoints or who regularly engage in the same or similar conduct on other issues without fear of being subjected to disciplinary proceedings.

240. As a direct and proximate result of the WSU Defendants' customs, policies, and practices, Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar suffered and will continue to suffer a loss of their constitutionally protected rights to equal protection.

241.   The WSU Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs Mallery, Robak, Abdrabboh, Rojas, and Sukkar.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against the WSU Defendants together with costs and attorney fees. Additionally, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants Strauss and Dmitruchina, individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

## COUNT FIVE

### 42 U.S.C. § 1983
### First Amendment Violations: Deprivation of Rights to Free Speech, Petition, & Assembly; Unlawful Restraints on Free Speech
### By All Plaintiffs Against WSUPD and Individual WSUPD Defendants

242.   Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

243.   Plaintiffs' First Amendment Rights to free speech, petition, and assembly were violated when WSUPD and the Individual WSUPD Defendants arrested and pressed charged against Plaintiffs without probable cause in retaliation for the content and viewpoint of their speech and expressive conduct.

244.   As a direct and proximate result of WSUPD and the Individual WSUPD Defendants' unlawful conduct, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected rights under the First Amendment.

245.   As a direct and proximate result of WSUPD and the Individual WSUPD Defendants' conduct, Plaintiffs suffered harm, including but not limited to severe and serious emotional distress, embarrassment, and humiliation.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against WSUPD together with costs and attorney fees. Additionally, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants Zarrief, Jiddou, Hundt, Parnell, Barksdale, Eisel, and Williams, individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

<u>**COUNT SIX**</u>

**42 U.S.C. § 1983**
**Violation of the Fourth Amendment: False Arrest**
**By All Plaintiffs Against WSUPD and the Individual WSUPD Defendants**

246.   Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

41

247.   Plaintiffs have a constitutional right, guaranteed by the Fourth Amendment, to be free of unreasonable search and seizure not supported by probable cause.

248.   In conducting their clearance of the encampment WSUPD and the Individual WSUPD Defendants had no probable cause that Plaintiffs committed any crimes, let alone trespass.

249.   Despite this lack of probable cause, Plaintiffs were charged with trespassing.

250.   Despite WSUPD and the Individual WSUPD Defendants' arrest, upon review, WCP Kym Worthy noted that there was no illegal activity conducted by Plaintiffs.

251.   The WSUPD and the Individual WSUPD Defendants acted under color of state law.

252.   As a direct and proximate result of WSUPD and the Individual WSUPD Defendants' conduct, Plaintiffs suffered harm, including but not limited to severe and serious emotional distress, embarrassment, and humiliation.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against WSUPD together with costs and attorney fees. Additionally, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against

Defendants Zarrief, Jiddou, Hundt, Parnell, Barksdale, Eisel, and Williams, individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

## COUNT SEVEN

**42 U.S.C. § 1983**
**Violation of the Fourth & Fourteenth Amendments: Malicious Prosecution**
**By All Plaintiffs Against the WSUPD and Individual WSUPD Defendants**

253.   Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

254.   To make out a malicious prosecution claim under § 1983, a plaintiff must show that legal process was instituted without probable cause and that the criminal prosecution was terminated in the plaintiff's favor. *Thompson v. Clark*, 596 U.S. 36, 44 (2022).

255.   As described above, Plaintiffs' arrests executed by WSUPD and the Individual WSUPD Defendants were not supported by probable cause, as indicated by WCP Kym Worthy, Plaintiffs' conduct did not rise to the level of illegal activity.

256.   The WSUPD's criminal prosecutions of Plaintiffs was terminated in their favor, as all charges against them were dismissed.

257.   The WSUPD and the Individual WSUPD Defendants acted under color of state law.

258.   As a direct and proximate result of WSUPD and the Individual WSUPD Defendants' conduct, Plaintiffs suffered harm, including but not limited to severe and serious emotional distress, embarrassment, and humiliation.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against WSUPD together with costs and attorney fees. Additionally, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants Zarrief, Jiddou, Hundt, Parnell, Barksdale, Eisel, and Williams, individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

## COUNT EIGHT

### 42 U.S.C. § 1983
**Violation of the Fourth & Fourteenth Amendment: Excessive Force
By Plaintiffs Robak, Nuzmeya, and Abuelenain Against WSUPD and the
Individual WSUPD Defendants**

259.   Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

260.   When they arrested Plaintiff Nuzmeya, WSUPD and the Individual WSUPD Defendants caused Nuzmeya to fall and have her hijab removed.

261.   WSUPD and the Individual WSUPD Defendants refused to allow Nuzmeya to put her hijab back on.

262.    When they arrested Plaintiff Robak, four WSUPD police officers forcibly held him down with their hands on his neck, causing him to black out momentarily.

263.    When arresting Plaintiff Abeulenain, a WSUPD officer seized her by her jacket.

264.    Plaintiff Abuelenain's jacket slipped off, but the officer then grabbed her bag instead, pulling it tightly and caused her to experience choking.

265.    The force used by the WSUPD and the Individual WSUPD Defendants in arresting Plaintiffs Nuzmeya, Robak, and Abuelenain, constitute conduct under the color of state law which deprive Plaintiffs Nuzmeya, Robak and Abeulenain of their clearly established and known rights, privileges, and immunities secured by the Constitution and laws of the United States.

266.    As a direct and proximate cause of the foregoing conduct, WSUPD and the Individual WSUPD Defendants deprived Plaintiffs Nuzmeya, Robak and Abeuelenain of their clearly established and known rights under the Fourteenth Amendment of the United States Constitution.

267.    More specifically, WSUPD and the Individual WSUPD Defendants deprived Plaintiffs Nuzmeya, Robak and Abuelenain of his right to be free from the use of excessive, outrageous and unreasonable force, which shocks the conscience and offends traditional notions of decency.

268.   As a direct and proximate result of WSUPD and the Individual WSUPD Defendants' violations of Plaintiffs Nuzmeya, Robak and Abeulenain's constitutional rights, those Plaintiffs experienced not only physical pain and emotional distress during the arrests but have subsequently experienced physical mental and emotional distress following their arrests.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs Nuzmeya, Robak and Abueenain are entitled to declaratory relief and appropriate injunctive relief against WSUPD together with costs and attorney fees. Additionally, Plaintiffs Nuzmeya, Robak and Abeulenain are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants Zarrief, Jiddou, Hundt, Parnell, Barksdale, Eisel, and Williams, individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

## <u>COUNT NINE</u>

**Malicious Prosecution in Violation of Michigan Law
By All Plaintiffs Against WSUPD and the Individual WSUPD Defendants**

269.   Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

270. WSUPD and the Individual WSUPD Defendants directly caused Plaintiffs' arrest and the institution of the criminal charges against Plaintiffs without probable cause.

271. The prosecution of Plaintiffs ended in their favor, as all charges against them were dismissed.

272. There was no probable cause to support the prosecution of Plaintiffs.

273. WSUPD and the Individual WSUPD Defendants acted with malice, as they had Plaintiffs arrested because of Plaintiffs' views, not a genuine concern to prosecute.

274. WSUPD and the Individual WSUPD Defendants knowingly furnished false and/or misleading information regarding Plaintiffs in seeking the prosecution of Plaintiffs.

275. As a direct and proximate result of WSUPD and the Individual WSUPD Defendants' conduct, Plaintiffs suffered harm, including but not limited to severe and serious emotional distress, embarrassment, and humiliation.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against WSUPD together with costs and attorney fees. Additionally, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants Zarrief, Jiddou, Hundt, Parnell, Barksdale, Eisel, and Williams,

individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

## COUNT TEN

**Gross Negligence in Violation of Mich. Comp. Laws § 691.1407**
**By All Plaintiffs Against WSUPD and the Individual WSUPD Defendants**

276.   Plaintiffs incorporate by reference paragraphs 1 to 201, as if fully set forth herein.

277.   Under Michigan law, law enforcement officers are not immune from liability for tortious conduct done in the course of their employment when that conduct amounts to gross negligence that is the proximate cause of a plaintiff's injury or damage. Mich. Comp. Laws § 691.1047(2)(c).

278.   "Gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. Mich. Comp. Laws § 691.1407(8)(a).

279.   At all relevant times, WSUPD and the Individual WSUPD Defendants were acting in the course of their employment and within the scope of their authority.

280.   WSUPD and the Individual WSUPD Defendants were under a duty to avoid engaging in conduct so reckless as to demonstrate a substantial lack of concern for whether injury resulted to Plaintiffs.

281.   WSUPD and the Individual WSUPD Defendants engaged in grossly negligent conduct with regard in seeking the arrest and prosecution of Plaintiffs.

Specifically, WSUPD and the Individual WSUPD Defendants engaged in conduct so reckless as to demonstrate a substantial lack of concern as to whether Plaintiffs would be wrongfully arrested, detained and convicted.

282.   WSUPD and the Individual WSUPD Defendants breached their duty by subjecting Plaintiffs to criminal process without probable cause.

283.   WSUPD and the Individual WSUPD Defendants breached her duty by engaging in unconstitutional conduct set forth above.

284.   The grossly negligent conduct of WSUPD and the Individual WSUPD Defendants was the proximate cause of Plaintiffs' prosecution without probable cause.

285.   As a direct and proximate result of WSUPD and the Individual WSUPD Defendants' conduct, Plaintiffs suffered harm, including but not limited to severe and serious emotional distress, embarrassment, and humiliation.

286.   WSUPD and the Individual WSUPD Defendants are liable for Plaintiffs' injuries and damages under Mich. Comp. Laws § 691.1407.

**WHEREFORE**, as a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against WSUPD together with costs and attorney fees. Additionally, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants Zarrief, Jiddou, Hundt, Parnell, Barksdale, Eisel, and Williams,

individually and in their professional capacities, together with costs and attorney fees, and any other relief this Court deems just and equitable.

**AKEEL & VALENTINE, PLC**

By: /s/: SHEREEF H. AKEEL
    Shereef H. Akeel (P54345)
    Hasan Kaakarli (P81099)
    Daniel W. Cermak (84660)
    Hayden E. Pendergrass (P86888)
    888 W. Big Beaver Rd., Ste. 350
    Troy, MI 48084
    (248) 269-9595
    shereef@akeelvalentine.com
    hasan@akeelvalentine.com
    daniel@akeelvalentine.com
    hayden@akeelvalentine.com

    Doraid B. Elder (P57728)
    1360 Porter Street, Ste. 200
    Dearborn, MI 48124
    (313)582-5800
    doraidelderpc@gmail.com

    Jeffrey L. Edison, Esquire (P25912)
    3434 Russell Street, Suite 104
    Detroit, MI 48207
    313.964.0400
    jelee@ix.netcom.com

    The Khuja Law Firm, PLLC
    Jamil K. Khuja (P71963)
    1360 Porter St., Ste. 200
    Dearborn, MI 48124
    (313) 263-3353
    jamil@khujalaw.com

    Ayad Law PLLC
    Nabih H. Ayad (P59518)

645 Griswold St Ste. 2202
Detroit, MI 48226
(313) 983-4600

Gerald Evelyn (P29182)
409 E Jefferson Ave., Ste. 500
Detroit, MI 48226
(313) 962-5300
geraldevelyn@yahoo.com

DATED: June 23, 2025                    *Attorneys for Plaintiffs*

## JURY DEMAND

**NOW COME** Plaintiffs, CALEB MALLERY, JACKSON ROBAK, NUZMEYA ABDRABBOH, AYAH ABUELENAIN, RIDAA KHAN, SAEIDA MARINI, JOHN PABLO ROJAS, and JENNA SUKKAR, by and through their undersigned counsel and hereby demand a Trial by Jury for the above-referenced cause of action.

**AKEEL & VALENTINE, PLC**

By: /s/: SHEREEF H. AKEEL
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Daniel W. Cermak (84660)
Hayden E. Pendergrass (P86888)
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
daniel@akeelvalentine.com
hayden@akeelvalentine.com

Doraid B. Elder (P57728)
1360 Porter Street, Ste. 200

51

Dearborn, MI  48124
(313) 582-5800
doraidelderpc@gmail.com

Jeffrey L. Edison, Esquire (P25912)
3434 Russell Street, Suite 104
Detroit, MI 48207
313.964.0400
jelee@ix.netcom.com

The Khuja Law Firm, PLLC
Jamil K. Khuja (P71963)
1360 Porter St., Ste. 200
Dearborn, MI 48124
(313) 263-3353
jamil@khujalaw.com

Ayad Law PLLC
Nabih H. Ayad (P59518)
645 Griswold St Ste. 2202
Detroit, MI 48226
(313) 983-4600

Gerald Evelyn (P29182)
409 E Jefferson Ave., Ste. 500
Detroit, MI 48226
(313) 962-5300
geraldevelyn@yahoo.com

DATED: June 23, 2025                    *Attorneys for Plaintiffs*